Case number 24-5004. Simon Ateba, appellant, versus Karine Jean-Pierre in our official capacity as press secretary to the President of the United States, et al. Mr. Dixon for the appellants, Mr. Myers for the appellees. Good morning, Mr. Dixon. Good morning, Your Honor. May it please the Court? My name is Josh Dixon on behalf of appellant Simon Ateba. Under this Court's decision in Sherrill v. Knight, the White House may not draw arbitrary distinctions among journalists at areas the White House is open to the press, nor may the White House regulate the press area in a way that forecloses effective judicial review. The White House's current hard-pass regime violates this command in two ways. First, requiring journalists who want to cover the White House to obtain Supreme Court or Congressional press credentials is constitutionally unreasonable. The Supreme Court has stated categorically it will not issue credentials to White House correspondents, and under the Daily Press Gallery rules, to obtain Congressional press credentials, journalists must show they have a need to access members of Congress. But there's no reason why a journalist who only wants to cover the White House should have to make such a showing. Second, the Congressional press credentialing regime violates the unbridled discretion doctrine in three ways. One, the Congressional credentialing regime gives the Congressional press galleries unbridled discretion to deny an application based on their conclusion that an applicant is not sufficiently of repute in his profession. This is an utterly standardless standard and allows the press galleries to discriminate based on viewpoint. Two, the Congressional credentialing regime does not allow for effective judicial review. The Congressional press galleries are not required to issue a written decision, and under this court's Consumer's Union decision, the press galleries are immune from suit when adjudicating applications for press credentials. So there's one part of this case that I'm having some difficulty with, and that's sort of conceptualizing the injury to your client, because this case strikes me as very different from all the precedents that are discussed in the past. You want to have a hard pass, but at the same time, the daily pass is available. So it seems that the burden on your client is not the typical one in First Amendment context, because most of the cases deal with licensing programs or schemes where you're denied access if you don't get this license. But here, it's really the difference between a hard pass and a day pass, and it seems to me that the difference is, and correct me if I'm wrong, under either pass, once you get into the press area, you have all the exact same ability to express yourself and conduct and exercise your First Amendment rights. But under the day pass, which is the default way of getting in, you have to apply for the pass, and then you have to wait to be escorted to the room. But you can apply for the pass, like on Sunday, you can apply for a whole week's worth of passes. So you could make that into unfettered access, except for the fact that you might have to wait to be escorted, and you might have to wait up to 45 minutes. So that's really the only difference between the two passes, as far as I can tell. And then I'm wondering, is that a de minimis burden on your First Amendment right? Is that a cognizable injury, that you just have to wait to be escorted? It's more, you have accurately stated the facts. However, the injury is more significant. There's the de minimis injury, insofar as because of that delay, which can sometimes be up to 45 minutes, while other journalists are filtering in to the press room, which has limited availability, the journalists could miss the ability to enter the room entirely. Has that happened? It has not. It has not happened that Mr. Atiba has been excluded from the room over the past year. What has happened, though, is because of that delay, and this is not on the record, but what has happened is Mr. Atiba has missed the beginning of a meeting. And I would also point out that this is a facial challenge, and so whether that has actually happened to Mr. Atiba over the last year is not relevant for the facial challenge. The point is, is that if World War III were to break out tomorrow, God forbid, and every journalist, and there are about a thousand of the last evidence that we have with a hard pass, were to descend on this press room with its 49 seats and limited standing room, because Mr. Atiba has to wait for the 45 minutes, he would be excluded. Up to 45 minutes. How long does he typically really have to wait? The record doesn't contain that information. He can wait up to 45 minutes, and of course on the day where a thousand journalists descend on the press room, he would wait at least the 45 minutes, just because of the hubbub of what's going on. And so I don't think it's quite right to characterize this as a de minimis injury. This is, on occasion, an exclusion. It is an actual exclusion from the room. I'm sorry, it's an exclusion from the room. How? Because by virtue of the 45 minutes, he would not have, the room would be full by the time that 45 minutes happened. What typically happens if the room is full? I'm sorry? What typically happens if the room is full? What happens to the overflow journalists with passes? I don't know that that's, that's not in the record, but what is in the record is that there are 49 assigned seats, and then there's standing room only. That would not accommodate the a thousand journalists who have a hard pass. It seems like that could be an important fact, if there's an overflow room, or you can, I don't know, here? I'm not aware of that. In the overflow room, he would not have the ability to engage, of course, with the press secretary. I'd also point out, Your Honor, that the government has admitted, and put out five of its brief, that the exclusion from the press area cannot be based on viewpoint. And because of that admission, I think that that closes the door on the argument that there's no First Amendment injury here, if it's significant enough to give rise to a retaliation. I think it's certainly a burden on a First Amendment right, because it affects access to this forum. It's just like, how much does it affect access is kind of what I've been struggling with. Is it enough of a burden for it to be cognizable? I think in context, and it is a, it's a right that depends on the rights that's being given to others. Because the only reason, that's right. The only reason we're here is because there's, there's two types of passes, you want the better one. And I just don't see a lot of analogous cases where, where that's the case that the closest one is this Wikimiko case, which is from the Fourth Circuit. And that suggests that where we've given you a benefit, and we've taken it away, and now you have this de minimis burden, there's no cognizable. I would point out that the Wikimiko County case was not a designated press area, it was a jail, and the ACLU had been given access to the jail. So this was different insofar as it was the First Amendment claim, though, that you're, you're intruding on our First Amendment right to petition the government, etc, etc. And they said, we gave you an accommodation, it was kind of like we gave you a press pass, that's an easier way to do your thing. We took it away. But the difference between you and all the other paralegals is the same. And you're not, it's de minimis that you have, you're now inconvenienced. Let me also direct your honor to Mansky. And Mansky, that was a case that involved the Minnesota prohibition on political attire. Yes. The way that that statute worked was there was an election judge that was stationed at the polling place. And the judge would look at the clothing and determine whether it was political. If the judge made that determination, there was no prohibition. The individual was allowed to go in. It's just that the individual was referred to the authorities for handling. And so there was no prohibition on the right of the individuals in the Mansky case to speak, to speak. Rather, it was just a burden on the entry, delays in entry, and then the possibility of having your name reported. I can also point your court, your honor to the Forsyth County case. In that case, there was a permit regime. The administrator had determined that there would be $100, um, fee to cover administrative costs. And rather than pay the $100 fee, nationalist movement sued. And despite the de minimis nature of $100 fee payment, the Supreme Court said, Yes, we're still standing to bring a facial challenge to this permitting regime, despite the fact it's only $100. So let me ask you where the logic of your argument takes us. Um, there are 49 seats, and let's say there are 20 standing room spaces. So maybe you have 70 people in the room, plus the press press secretary. So having 100 hard passes may be the maximum that you decide makes sense under this situation. And therefore, you set up a hard pass system that has a lot of qualifications, none of which have anything to do with your viewpoint. It may be that we want people who are married, or people who have two children. It may simply be that we be people who are admitted to the House and Senate, or maybe the Supreme Court. It's a way of filtering without getting into viewpoint discrimination, at least as it's traditionally been defined. So here, you don't argue, and I understand why I think that your client's viewpoint is what's issue. Rather, you refer to what you've been discussing with Judge Pan, in terms of what's the nature of the First Amendment injury. And that's where I we're all having trouble. And I understand from your client's point of view, it would be much nicer not to have to do this daily submission or weekly submission. And there seems to be a suggestion that if you had a hard pass, you might get called on more often. But I don't see anything to back that up. So your client does not like the fact that he has total access. But he has to do a bit more in the way of administrative matters in order to get that access. And as you point out, he may miss the beginning. Or there may be a mad crush for the 70 seats and standing room that are available. But I don't see any argument here that this regime is based on some sort of impermissible standard in terms of viewpoint. Am I correct about that? Well, Your Honor, that's a yes or no. We do not allege in this proceeding that the hard pass program was adopted based on Mr. Atiba's viewpoint. We made that argument below that was dismissed and we have not appealed that. So that is not before us. That's what I want to confirm. There is no claim that viewpoint is at issue here. We have only claim, as I understand it, subject to your answer to Judge Pan, is there's an administrative burden and you don't know what of repute means. We have argued that the lack of discretion or the abundance of discretion, I have to say that the lack of ways to cabin the discretion of the congressional press galleries is de facto viewpoint discrimination because of the conclusion that you just told me, counsel, you were not making a viewpoint discrimination argument. I need to be clear about that. And you can't come in the back door. We have said we want, and I gave you hypotheticals, people with two children, a boy and a girl, people who are married or only single people or people who've only gone to public schools. There's no viewpoint in your argument. You don't like the way the Senate selects its press people or the House. And you say you have no interest in the Supreme Court. So that's meaningless to you. Our argument, Your Honor, is not that it was on this proceeding, again, that he was targeted because of the viewpoint. However, our argument is because of the lack of procedural protections in the procedural, the congressional press gallery proceedings, that lack of adequate safeguards constitutes de facto viewpoint discrimination under the Child Evangelism Fourth Circuit case, the Kamau Ninth Circuit case. And so we're not alleging he was targeted on this proceeding because of the viewpoint, but that the congressional press gallery rules are insufficiently protective of viewpoint discrimination. So I thought your argument there was your client has no interest whatsoever in covering anything in the House or Senate, which is a different argument from saying that there's something wrong with the way the House and Senate choose people for their press galleries. Those are separate arguments. Yes, but what I'm getting at is you could make that argument the way you framed it about any set of criteria that are, is established for the hard pass. I don't believe that's correct, Your Honor. For example, your example about limiting the membership to the hard pass program to those who are married. I think that would be constitutionally unreasonable. That has no bearing on coverage of the Supreme Court. Precisely my point for people who went to public schools. That's my point. Any set of criteria, you will say your client has no interest. It's irrelevant. He wants the hard pass. And I'm just trying to understand what are the limits of your argument or are there no limits? And the only option available to the White House for the hard pass is, I'm not sure how you would define it. Come January 1, the first 100 people to arrive at the White House get a hard pass and that's it. That is not our position, Your Honor. I'm sorry, I've misunderstood you until now. There are absolutely reasonable limits that the White House can place on those who are eligible for the hard pass. And who makes that decision? Because their argument is, why wouldn't they rely on the other branches of government and just piggyback? If the White House were to make a rule, for example, that, as Your Honor knows from the briefing, one of the requirements of the congressional press galleries is that they not be engaged in lobbying. The journalists not be engaged in lobbying. If the White House were to publish a set of standards that included not being engaged in lobbying, that would be permissible. It is permissible to restrict individuals who are there at the White House to cover the president for bona fide journalism. And if they're there to press a claim or be- Well, who knows what bona fide journalism means? You don't know what repute means. The requirement that a journalist not be engaged in lobbying is a way to filter out individuals who are not there for the purpose of engaging in journalism. And so that rule would be perfectly permissible. A rule limiting, as the White House does now, for example, residents of the D.C. area. The purpose of that, I presume, is to ensure that an individual is We're not challenging that. But Your Honor, again, going back to Your Honor's hypothetical, married person, that has no bearing on coverage, just like requiring an individual to obtain a press pass to cover Congress has no bearing on whether they are covering the White House as a legitimate journalist. But, I mean, okay, I understand your argument, but, you know, we as lawyers have to take a bar exam in order to have the ability and privilege to practice law. You know, it has lots of subjects on it. You know, I may not ever intend to work on trusts and estates or property. I just want to practice criminal law. They make me study that, learn it, pass it on to bar exam in order to practice, even though I'm not going to and have no intention of practicing in those areas. You know, life's, you know, you know, life's not fair. You know, he may not want to ask any questions in Congress, the House and Senate. Okay, fine. How is that a First Amendment? How is that so unreasonable that it's a constitutional violation and a facial challenge? Well, it's not just that he doesn't want to ask questions of Congress. It is that to get the press pass for Congress, he is required to demonstrate a need for access for members of Congress. And so that's much more restrictive than just, you know, not wanting to cover Congress. But be that as it may, we don't license journalists in this country precisely because of the First Amendment considerations and what they're doing. I don't know specifically whether there's a First Amendment right to practice law. Maybe I have a right to speak right now. I don't know. But the point is that the bar exam measures a lawyer's overall fitness and ability to perform the tasks of that job. Whereas when we're talking about a journalist, we're talking about speech, pure speech in a way that knowing trust and estates, it's just very different. And I know my own practice, Your Honor, while I don't do trust in estates law, there are absolutely occasions where having a baseline knowledge of trust in estates law would come in handy in what I'm doing. And so I think it's perfectly reasonable for a licensor in the bar situation to assure a reasoned, well-rounded knowledge of the profession one is engaging in. Whereas with journalism, again, pure speech, free speech, and there's no licensure in this country. Let's switch gears for a second to go back to where we started along the lines of Judge Pan's questioning. In a facial challenge in any context, whether it's facial overbreath, facial void for vagueness, kind of First Amendment context, there's always a substantiality aspect of you can't win an overbreath challenge unless, because you can point out one or two hypothetical instances where a statute might restrict First Amendment expression. It's got to be substantially overbreath. Doesn't the precedent require us to look at this challenge that you were making in the same fashion? And doesn't that yes or no to that? And then if yes, then doesn't that impact on whether we think that this injury is substantial enough to require us to proceed down the road of the merits, so to speak, of your First Amendment arguments? No, Your Honor, it does not. Substantiality or substantial overbreath is obviously a requirement in the overbreath doctrine context, but that's not the claim we've alleged here. We've alleged a violation of the unbridled discretion doctrine. And under the City of Lakewood and similar line of cases, a facial challenge is appropriate whenever the licensing regime could result in the chill of speech or could make it difficult for the plaintiff to demonstrate actual viewpoint discrimination. And the reason for that is because an individual who consciously chooses to chill their own speech based on the discretion that's been granted to a licensor, that claim can never be brought. You can't bring a First Amendment challenge to your own chilling of speech. And so the Supreme Court said in the City of Lakewood, whenever there's an opportunity or possibility that a licensing regime will chill speech or conduct closely associated with speech, that's sufficient to bring the facial challenge. In the constitutional reasonableness standpoint, it is our position that in every case requiring an individual to demonstrate a need to cover a member of Congress is constitutionally unreasonable to cover the White House. And so our argument with respect to constitutional reasonableness is that it is facially invalid because it is facially invalid in all of its applications. We have to look at that requirement in the context of what are the well-established, I guess, procedures of this committee, because it seems like they are allowing a lot of people who don't require access to the congressional galleries to have these passes. That's why there's a whole White House press corps that have the press gallery credential as well. And it, I mean, can we look at this? I know it's a facial challenge, but it says that these rules have to be interpreted by this committee, and are they interpreting that committee broadly? Because they do credentialing for conventions and other events that have nothing to do with access to the Senate gallery. Well, to be clear, with respect to the conventions and other credentialing, in those situations, the press galleries are not looking to whether the credentialees are wanting to cover members of Congress. So they don't apply these rules to credential those? They do not apply that requirement that the individual, for example, if an individual wants to cover the DNC, the congressional credentialing agencies are not evaluating whether they have a need to cover Congress. They're not required to by these rules? That is not in the record. I can tell your Honor that on the, I can't remember which of the four credentialing agencies it is. I believe it is radio and TV. It specifically says on the website for that agency, we do not require that you show you have a need to cover Congress. The point is. So I guess my question is, if they can do that with respect to conventions, we're going to remove this requirement for conventions. Can't they do that with respect to the White House? Absolutely. And aren't they in fact doing that because they are credentialing people to be in the White House press corps who are not primarily covering Congress? And isn't that consistent with the rules? Because it says the rules shall be interpreted and administered by the standing committee. So maybe they're interpreting and administering in this well-established way. The fact that the rules are, if the rules are in fact being administered in a way that they're not written, that's its own problem. I mean, this court said, your Honor, in the Archdiocese of Washington case that the inequitable or differential application of rules itself is constitutionally unreasonable. And so if they have this written requirement that they're not applying or not requiring for esteemed journalists, that's a bigger problem because that demonstrates that they are just- That's actually the problem that you don't like. And if they're ignoring it, you think that's bad too. If they're ignoring it for some people, yes, I do think that's bad. What if they're ignoring it for everybody? They are allowed to interpret it and administer the rules and say they're interpreting this not to require this because it doesn't work as a practical matter. They've been doing this since 1888. They can change their ways of doing this. I mean, if they, in fact, we have, there's no record evidence that they are doing that. All we know is that there are some members of the White House Correspondents Association who are also have a congressional press pass. But if they are doing that, then that creates its own unbridled discretion doctrine. What we know is that the rules say X. And if they're interpreting the rules in a way for some people where they're, you know, winking and nod, rushing onto the carpet, that's its own problem. My issue with your unbridled discretion argument is as follows. So basically we're talking about a non-public forum, whether it's limited or non-public, it's non-public. And so the White House just has to be reasonable and viewpoint neutral. And you're saying, well, they're not being reasonable because they're farming this out to a committee that has unbridled discretion. Like, so I kind of understand your argument to be the White House is exercising unbridled discretion because they're kind of delegating their authority or this committee is like their agent. So the White House is exercising unbridled authority. But then you look at the rules that govern what this committee has to do. And it is so different from the cases involving unbridled discretion, where really you've got government officials who really have no limits on how they do things. And you look at these rules and they're pretty specific and they kind of support the idea that we want people who are going to come into our White House press area or congressional gallery to be journalists, not lobbyists. So when they say bona fide journalists of repute under such rules as a standing committee, of course, on the shelf prescribed, they're just saying, we want you to be a journalist and not a lobbyist, somebody who actually is here for the purpose that you say you're here for, because there's stuff in the record about people pretending to be journalists when they're really lobbyists, things of that nature. And it's reasonable because the White House doesn't have a credentialing apparatus. They are not the ones interviewing these people to see if they're real journalists. They're just going to adopt whatever this committee decides. Congress has also delegated its authority to this committee and they're journalists. So they're the ones who can decide. Why isn't that reasonable? And why is it not an unbridled discretion? Because there are a whole bunch of rules and regulations about what  I'll just add two points, if I may, Your Honor. The White House does not currently credential applicants, but it did for the first half of the Biden administration. So the White House has the capability to do this. There's also the White House Correspondents Association, which- Well, they did not rely on Congress to do this, but we don't know what they were doing. And now they're saying, we're trying to rationalize this process. There are too many hard passes. We want you to be a real journalist. Maybe they weren't checking to see if you're a real journalist before, but now they want to. And it's very consistent with their history of doing things. There's only two years in which they didn't do this, apparently, in recent history. But I just don't know why it's not reasonable and viewpoint neutral, which is all we need to decide. It is permissible, we believe, for the White House to delegate the task to- It could delegate the task to the White House Correspondents Association. The problem is, number one, that does not cure the risk of viewpoint discrimination for reasons we've put in the brief. The bigger problem with the of repute standard, though, is Your Honor is absolutely right. There are five or six credentials that the congressional press galleries apply. But it's not a freestanding of repute requirement. Of repute, under such rules as the Standing Committee of Correspondents shall prescribe. And I'm assuming that the Standing Committee has to abide by these rules. I was curious about this. These rules are by who? Those rules were created by the committee. Right. The Committee on Rules and Administration, not by this- No, Your Honor. They were approved by the Committee on Rules and Administration, but they were promulgated by the Senate Daily Press Gallery. Okay. Judge Bates said we have to look at this requirement of repute in light of all these other requirements that are in this rule. And if this whole rule was interpreted and, I'm sorry, prescribed by the committee, then you don't just look at repute, you have to look at the whole thing. That's absolutely correct. I mean, if an individual is a lobbyist, for example, they're out. We have no problem with that. The problem is that one- That's not unbridled discretion. There's a whole bunch of detailed rules here. But one of the rules requires that the journalist be a journalist of repute, which basically means have a good reputation. And so because that- Not necessarily. I think it means that you're a real journalist. That's what bona fide means, Your Honor. We don't take issue with the word bona fide. Our issue is with the word of repute, which means that you have to be a journalist that has a good reputation, which it doesn't matter how many other rules cabin discretion. The problem is this one rule undoes all of that and says, if this journalist ticks all these boxes, we conclude they're not sufficiently of repute. Only we agree with you that of repute is a freestanding requirement that is not informed by everything else. That is correct, though there's no evidence that the press gallery is applying that rule to be informed by the other- But the rule requires them to. It's of repute under such rules as the standing committee shall prescribe. And you agree that they prescribed all of these rules. Yes, Your Honor, but that reads- The of repute, it's very explicit under the rules. We don't read it that way. We believe that the of repute requirement is its own standalone requirement. But that's contrary to what is actually written in the rule. It says of repute under the rules prescribed by the standing committee. If you look at the House rule, for example, rule six, it doesn't define of repute in this way. It just is its own standalone requirement. I don't believe that- But that's not the one you're challenging. You're challenging this one. Well, that's the one that gives the gallery's authority to do this. Okay. Yeah, so I would also point out, Your Honor, before I let my time run too far over, that in addition to the unbridled discretion argument vis-a-vis the of repute requirement, there's also the problem that there's no possibility of judicial review. There's also the possibility that there are no timelines. And so even putting aside the of repute requirement, the Supreme Court has made very clear that when speech is being licensed, there has to be a mechanism for judicial review. And there's simply not- Under the specific circumstances here, I can see why those requirements might be important if we're talking about a licensing scheme that says you can or cannot express yourself. But we're not talking about that here. We're talking about, can you get in 45 minutes earlier? Under those circumstances, why isn't this whole scheme reasonable? I mean, I just think that you have to look at the injury that is being allegedly inflicted on your client. That takes us back to Your Honor's first set of questions, which is- But I think it just informs, though, the reasonableness of all of this. Well, I would simply submit, Your Honor, that requiring an individual to wait 45 minutes and the risk that if a significant news event occurs, they're not going to be able to get in that room with their competitors and ask the questions they're entitled to ask. Well, I understand that. And given that that is the only injury that we're talking about, I agree that it's a burden on his First Amendment rights, but it's a pretty small one. I'm not sure if it's de minimis or insignificant, but it's a pretty small one. And given that that's all it is, it seems to me that all the cases that talk about time limits and things of that nature aren't really as relevant, because those are talking about, we better give you an answer, because if we don't give you an answer, you can't exercise your First Amendment rights at all. It's not that you have to wait 45 minutes to exercise them. It's you cannot exercise them at all. We better give you an answer. On that- That's different. I would point, Your Honor, to the Seattle Affiliate case. That's a Ninth Circuit case. We cited in our brief. In that case, there was a permanent requirement to march on the streets, but individuals could march on the side even without a permit. And- So what was the name of that case? Seattle Affiliate, a permit to march in the streets, no permit required to march on the sidewalks. And the applicant applied and made a facial challenge. And the Ninth Circuit addressed this precise question. I don't remember the footnote, four or five, said specifically that even though they can march on the sidewalks, the fact that they are prohibited from marching in the streets is a significant enough First Amendment injury to give these protections that apply in speech licensing regimes. We would submit that the same type of analysis should apply here. Is it a complete prohibition of speech on a day-to-day basis? It is not. But there is a circumstance under which Mr. Atiba- If it's a march on the street, we have to get back to you in time for you to be able to march. So that- I can see why there's more of a time constraint in that case that doesn't apply here. Potentially, although Mr. Atiba is current, I mean, he's had his application pending for 16 months. So during that time period, like I said, there have been times when he has tried to enter the room and he has been able to, but he was late and he missed the briefing. So that we believe all of that constitutes First Amendment injury sufficient to kick in these procedural protections under the unbridled discretion doctrine. All right. Any other questions at this point, this juncture, Judge Rogers? No, thank you. All right. Your time is up. We'll give you a little bit on rebuttal. Let's hear from the government. Mr. Myers. Good morning, Your Honors. May it please the Court, Stephen Myers on behalf of the government. This lawsuit is an attempt to stack First Amendment doctrine upon First Amendment doctrine to ultimately invalidate permitting system or a credentialing system, I should say. That's been working for decades or longer to distinguish between journalists on the one hand and lobbyists or other individuals who would find it convenient to have access to senior government officials on the other. We think the lawsuit fails at every single step, whether that's the nature of the injury or the nature of quorum, but probably the easiest way is just to recognize that the criteria at issue in this case are longstanding, clear, reasonable, and viewpoint neutral. And in fact, Mr. Atiba has pointed to no time when the congressional galleries have ever abused their authority to discriminate either on the basis of viewpoint or against their economic competitors. And so, you know, for the court to sort of agree with Mr. Atiba at every contested step of the analysis to get to a point where the court is saying that Congress has been breaking the law for 136 years would really be quite extraordinary. And so I want to emphasize that, you know, the requirement that a journalist be bonafide dates to 1859. This over-repute requirement dates to 1888. And again, the speculation aside, like we're here on summary judgments, and Mr. Atiba has just not pointed to any evidence of times when this system has broken down and hasn't worked. With respect to what the rules say, Judge Pan, I think your honor is thinking about it exactly the right way. So paragraph three of the Senate rules is sort of setting out what the role is of the standing committee. So it's their role is to do the screening of bonafide journalists of repute under such rules as the standing committee shall prescribe. And then the question is, well, what are those rules? And those are listed in the next paragraph. That's in paragraph four. And those are the things like being a full-time correspondent who resides in Washington, is independent of a lobbying organization, etc. Again, this court's cases in Zuckerman, Supreme Court, and City of Lakewood tells us that we can look to well-established practice. Here, the well-established practice is that legitimate journalists who want to report the news are not being discriminated against. And so, you know, for that reason, there's no reason for this court to be skeptical of this system that has been working. But what about the argument that you don't get any sort of written decision, there's no deadlines, it's essentially an invitation for, you know, arbitrary action? I think a number of responses, Judge Wilkins. One is that, again, there is no evidence of arbitrary action. That's simply not what's happening. If you look to this court's decision in the Consumers Union case, you know, the court said the purpose of this requirement is just to ensure that consistent with space limitations, you know, these spaces will be used by bona fide reporters. But in terms of those heightened procedural protections to which Your Honor was referring, the Supreme Court's cases and this court's cases make clear that those are needed when we're talking about prior restraints on expression. And this is different from that sort of case, I think, for at least two reasons. The first is that no one is telling Mr. Atiba what he can say, like put aside the existence of the Day Pass program entirely for a moment. This is just about entering the White House. It's not saying you can't engage in sort of core First Amendment activity. But then layer on that the fact that the Day Pass program is available. And, you know, then you recognize that Mr. Atiba still can enter the White House. And that is further weakening any First Amendment interests that might be at play here. On that point, I want to return to an issue that the court was discussing earlier with my colleague about the burden on entering with a Day Pass and this 45-minute issue. If you look in the record, it's ECF 17-2. This is an email from the press office to Mr. Atiba explaining that the escorts to enter the press facilities are available at the top of every hour when the White House is open to journalists. So, you know, 8 o'clock, 9 o'clock, 10 o'clock, 11 o'clock, et cetera. So this 45-minute issue is only going to arise if a journalist doesn't just plan his arrival for a time when an escort is available. And so if you show up, you know, when the escort is there, the White House... Is there ever sort of an emergency snap, like press briefing, like something has happened? Let's like do it right now, or is there always enough notice for this to work? That's not in the record, Your Honor. And I don't want to represent, you know, that that doesn't happen just like as a news consumer. My understanding is that generally they're announced in advance. The West Wing, that happens. Exactly, exactly. But on the summary judgment record, stepping away from the West Wing, I think what I would say is that Mr. Atiba, and I think counsel confirmed this, hasn't pointed to a time when he has actually been unable to access a White House press briefing because of this fairly limited requirement. Says he's been made late. And again, I don't think that's in the record, but even assuming that is true, if Mr. Atiba, you know, plans ahead, shows up at the top of the hour when an escort is available, then that problem shouldn't logically arise. But of course, this question of whether or not there is a First Amendment injury is really only the first question. And, you know, we're delighted if the court disposes of this case at that step, but it can also dispose of this case by just saying that what Congress has been doing for 136 years, a perfectly reasonable way of doing this, what the White House has been doing for, you know, 50-odd years. It's perfectly reasonable. So on the nature of the injury, though, there doesn't seem to be a lot of case law that has said something like this is de minimis and not cognizable. And certainly nothing binding. I don't see anything from the Supreme Court or the D.C. Circuit that presents an analytical framework that says this is so de minimis, we're not even going to consider it a First Amendment burden. I think that's fair. Conversely, you know, as we point out in our brief, I don't think this court has said the converse, which is to say that this court's cases and Sheryl and Karam have dealt with a complete loss of access to the White House. That's not the case here. And actually, if I could return to that point very briefly, in Mr. Otiba's reply brief, he suggests that Mr. Karam in the Karam case could have continued to access the White House with a day pass. I don't think that's accurate. The complaints in the Karam case alleges that he wasn't sure if he would be able to use a day pass. And given the circumstances in that case where the White House had imposed a suspension as a punitive measure, seems highly unlikely. And it's certainly very, very different from this case where every time he sought access through the day pass program, it's been granted. So I think that your friend on the other side, just anticipating what they might say, would say that the denial of the hard pass is at least somewhat analogous to a prior restraint, because if you can't get into the room, you can't gather news and you can't express yourself. You can't write an opinion or you can't, you know, if you miss the briefing, then you can't express yourself. It's not a prior restraint in that, you know, we're banning you from saying something in particular, but it's a prior restraint, at least adjacent, because we're preventing you from access potentially to what we want to talk about, right? So what's the response to that argument? So I think the Supreme Court's prior restraint cases are generally focused on sort of two features of the restriction. One is it is generally a content or viewpoint-based restriction. That's not alleged here. Second, it is, as your Honor noted, a restriction on what you can say, and that is not alleged here. It is, you know, at most a regulation of when you can enter the White House, which is not itself an expressive activity. But even if the court doesn't buy what I'm selling on those two points, then you get back to the fact that we have the day pass program, which Mr. Atiba, I think, acknowledges has been made available to him every time that he has sought to use it. And so those things in combination bring this case really quite far away from the Supreme Court's sort of classic prior restraint cases, where it's like, no, you may not speak on this topic on pain of punishment. Like, of course, we have really strong procedural requirements in that sort of restriction, because that is a core First Amendment value, that you not be limited in what you can say. That's just not what's happening here for a number of reasons. Well, let's suppose the policy is we're not giving hard passes to CNN, any CNN correspondence. Or we're not giving hard passes to any MSNBC or Fox. They, you know, they pick one or more of those and say, none of them gets hard passes. They can get day passes. And the evidence is that they can get day passes, they don't miss any briefings, but they have to go the day pass route, rather than the hard pass route. Right. Does that, is there no First Amendment violation there? I think the premise of Your Honor's question, if I'm understanding it correctly, is that there is viewpoint discrimination motivating selection of outlets? We don't know. They just say, you know, we just believe that we're not going to allow any of those three networks, you know, any of the correspondence from those three networks to have hard passes anymore. They just have to go the day pass route. So without knowing more, if the White House had a reason for doing it that was reasonable, and they weren't engaged in viewpoint discrimination, they weren't saying they don't like the tenor of the coverage, then no, it's not obvious to me that there would be a First Amendment injury. Now, Supreme Court's cases make really clear that viewpoint discrimination is its own sort of species of evil. And so if there were viewpoint discrimination going on, I think my answer would be very different. But again, that's just not, that's just not what's alleged in this case. Mr. Atiba has abandoned the allegation. There's viewpoint discrimination going on here. Judge Rogers, do you have any questions? I guess not, other than to observe we're not in 1859. And so the fact that it's been going on all those years, I don't know how much that persuades me, except to the extent that the burden is on the challenger to convince us that there's something wrong with what's going on. And that's where it's difficult here. I have been concerned about the fact that we don't know what will happen with the delay in getting the Senate or the House to act, where how the Supreme Court views this in terms of is this de minimis or is it significant, substantial in terms of a First Amendment injury, or is it just going to take the view that, you know, courts have no role in saying how the House or Senate run their bodies. And to some extent, that would be true with the White House Press Corps. It's just a general observation because the arguments are coming to us. Look, it's been done all these years. He's getting in. If he shows up on time, there'll always be an escort. What's the issue? It's a limited space. So if I may, Your Honor, I think to try to take those two points in order on the fact that this has been the system for a long time, that point isn't relevant in a vacuum. I'm not trying to stand here and say, well, we've been doing this for a long time, therefore we can keep doing it. I think the history, though, is especially relevant because the Supreme Court's cases tell us that we can look to, you know, well-established practice to know if the criteria are sufficiently clear. And so when there is this long history of the congressional galleries applying these criteria in a fair, reasonable, viewpoint-neutral way, that history suggests that there isn't a constitutional problem here, or at least further evidence that there isn't a problem here. Then on the point about the delay with the galleries, you know, I think it's a little bit difficult for me to stand here and explain, you know, what the status of the application before the Senate gallery is. Obviously, that's pending with the Senate, not with the executive branch. Just as a layperson, you know, as I stand here, it's not obvious to me that Mr. Atiba necessarily qualifies under the Senate rules. And that's because, again, it is just not, like, obvious to me that Today News Africa publishes daily, nor is it obvious that Mr. Atiba is a full-time paid correspondent for that, you know, irregularly updated publication. So it is certainly possible that's what's going on here. I don't want to speculate more than I am, but I don't think the Court needs to be that concerned, again, because there isn't that history of discriminatory application here. The evidence suggests that this is a way that works of establishing a Congressional press corps and a White House press corps. Can I just- I appreciate your responses, counsel. And I just want to say that in my lifetime, the nature of press coverage has changed dramatically. All right? So we're talking about rules that were set up in a very different press context. And Mr. Atiba is part of that new- and by new, I mean, what, 40 years nature and all the podcasts, et cetera. So what is a credentialed White House press corps person is- it's just interesting to consider. And then the delay, I suppose the burden is on him to show more than incidental inconvenience. That would be our view, yes, Your Honor. Yeah. Thank you. Can you help me just understand the escort policy? So if you have a day pass, you have to be escorted to the briefing room, right? To the press area, as I understand it, yes. To the press area. And what about once the press conference is over? Do people with day passes, do they have to be escorted? You know, once they leave the press area, they have to be escorted off the grounds? Or can they mill about or mill around in the White House? As it's explained in the record, and as I understand it, the escort requirement is applying on the entrance into the building. I don't understand there to be a separate escort requirement beyond that, at least based on what is in the record. So if that's the case, I mean, in your briefing, you talk about, well, this is one way for kind of national security, et cetera, purposes, you know, the distinction between who has a hard pass and who has a day pass. You know, the people who have hard passes essentially get more vetting. And that's why they can enter unescorted. But the people with day passes don't necessarily have as much vetting, so they can get in, but it's only with an escort. But if the escort is only walking them to the room, but then they can roam around the White House grounds after the briefing is over, then doesn't that just kind of poke, make Swiss cheese out of the argument that somehow having the hard passes is important for security purposes? I don't think so, Your Honor. The hard pass is a longer-term credential. It lasts under the current policy for a year, you know, whereas with a day pass, you do need to every day, if you choose to do it that way, to get access to the White House. And so, the White House has determined that it's perfectly reasonable to have more criteria for this longer-term credential. But why is it reasonable to require an escort to get to the briefing room, but not to leave the briefing room? Again, I don't want to say too much about what's required to leave the briefing room. That's just not in the record. I don't want to get beyond the bounds of that. Is it possible that you actually need an escort to leave the briefing room? I have no reason to think that. I just don't think it's addressed by the record. And so, I'm nervous about speculating about things that aren't described in the record. But I think the answer to the court's question, as I understand it, in any case, is, you know, why have these requirements for the hard pass that don't exist for the day pass? I think the answer to that is just before the White House is going to give a longer-term credential, it doesn't require this daily or weekly application. It makes sense to be a little bit, you know, more demanding. I understood the question not to be having different credentials for the hard pass versus the day pass. I understood the question to be, why is this a reasonable burden if it's not imposed on both ends of the press conference? I'm sorry, the burden being? The burden being, why do you have to wait 45 minutes for an escort if after the briefing, you can, as Judge Wilkins said, wander about freely in the West Wing? Well, I don't think you can wander about freely in the West Wing. I mean, journalists are still subject to a conduct policy that makes clear, you know, you don't allow- Okay, but you don't need an escort on the back end, why? Why is that reasonable? Because then that 45-minute burden doesn't seem to make sense. I think as the case comes to this court, the question is just whether the requirements for the hard pass are reasonable. And, you know, for all the reasons I'm trying to articulate, they are. Well, maybe the answer is it's not in the record what happens at the end of the briefing. Well, and again, we're here on summary judgments, and I don't think that Mr. Ateeb has developed the argument or the evidence with respect to that question about what happens. Can you just give me your best response to your colleague on the other side's argument that, on its face, the requirement that the paid correspondent has to require on-site access to congressional members and staff, why is that unreasonable in the context of trying to get a pass? So, I know Your Honor asked for one answer. I'm going to give you two. One, I'm just not sure it's squarely presented here. I'd point the court to JA40. This is Mr. Ateebo's application for a Senate credential, where he says, we are thrilled to inform you that Mr. Ateebo will now be extending his coverage to include the Senate and the House of Representatives. So, he has told the Senate he would like to cover them. Beyond that, as to why it would be reasonable in the abstract, I think the White House has made a very reasonable decision here that it does not want to be in the business of deciding which journalists are sufficiently bona fide of repute, non-lobbyists, etc. It just does not want to be in that business. And so, it's very logical for the White House to say, well, who else does this credentialing? Who is kind of like the White House and might be able to do this? And so, it landed on the other two branches of government, Supreme Court and Congress. And again, the system has been working. There is no evidence that White House reporters aren't able to get these credentials. That's how we have a body of White House correspondents. But do you agree, though, that in delegating this task to this committee, it's as if the White House is requiring these credentials? I'm sorry, as if it's requiring which credentials? So, the White House, like Congress, is delegating the task of credentialing to this committee. And so, this committee is like their agent. So, whatever rules this committee imposes are rules imposed by the White House, aren't they? I don't think it's fair to say that the congressional committees are acting as an agent of the... Or a delegee. I wouldn't even put it that way. One of the points we've made in our brief, for example, is that to qualify under the White House policy, you need to be assigned to cover the White House. And so, independent publications decide which of their journalists are going to be assigned to cover the White House. But that doesn't mean that the editors of the New York Times or the Washington Post are acting as the agents of the White House when they make those coverage decisions. It's just a simple objective fact. Are you credentialed by Congress or not? And it's reasonable to look to that because Congress has been in the business of doing this credentialing for well over a century. I'm happy to answer any other questions or just ask the court to affirm the judgment of the district court. All right. We have your argument. Thank you. Thank you. All right. Mr. Dixon, your time was up, but we'll give you three minutes in rebuttal. Thank you, Your Honor. I'd like to address first the argument that this is constitutional because it's been happening for a long time. Obviously, this is not a founding era practice. It started in 1888, not 1700s. This is not like March Against Chambers, where the Congress that adopted the Establishment Clause opened with legislative prayer. It started 100 years later. Obviously, there's a concept in our jurisprudence of constitutional liquidation, where ambiguous provisions can be given meaning under Federalist 37. But the case law establishes that when we're talking about liquidation, what we're talking about is structural provisions of the Constitution or separations of powers like the Noel Canning case or like the Pocket Veto case. This is a case involving First Amendment rights. And in that setting, the Supreme Court, to my knowledge, and certainly not in the briefing, has decided that liquidation is an appropriate concept. Moreover, since 1975, individuals have been unable to challenge this press credentialing regime under this Court's decision in Consumers Union. And so it's categorically impossible or inappropriate to say that the citizenry has acquiesced in this regime because since 1975, the citizenry has been unable to sue over it because the Congressional Press Gallery process is immune from suit under the Speech or Debate Clause. The government, as I understand them, they seem to admit that viewpoint discrimination in the allocation of hard passes would give rise to a First Amendment injury. I don't understand how, if that admission is on the books, which it is in footnote five of their brief, they can say that any other types of reasons for denying a hard pass could not give rise to injury. Either it is or it isn't. And the government has admitted that it is. It is true, as my friend points out, that there is no evidence, in the record anyway, of Mr. Thiebaud missing a meeting. But again, I would emphasize that this is a facial challenge. And our argument is that because of that possibility and the real possibility that could happen by torture of the delay, that we don't need to establish the existence of actual injury. I would also point out that the White House... I'm sorry, can you respond to that? Because I think your friend on the other side said that your argument that the requirement that the correspondents require onsite access to congressional members and staff is not properly raised because your client said he would cover the House and the Senate. He did in his press gallery application say that he was wanting to cover the House and the Senate. But again, he should not have to make the showing that that is necessary for him to cover the White House. So was this litigated before Judge Bates? This precise question, I don't recall it being raised below, Your Honor, no. Can you just... I'm sorry, clarify, you're saying that the government has conceded that there's an injury? That's our position. The government does not come out and say that. And what would we look to find such concession? In footnote five of the government's brief, they admit that the White House cannot dole out hard passes based on the viewpoint of the denied based on the viewpoint of the journalist giving rise to First Amendment injury than any other reason for denial would constitute a First Amendment injury as well. We might not prevail, but we would at least have First Amendment injury based on the failure to issue the hard pass. As far as the necessity of the hard pass, I would also point out that the White House Correspondents Association took the position in prior litigation in the brief that we submitted judicially notice that the hard pass is necessary for any White House correspondent to cover the White House. And then finally, Your Honor, the White House, my friend on the other side says that the White House doesn't want to do credentialing itself. Again, we don't have a problem with that. The problem is when it's allocated to an entity that has unbridled discretion as part of its criteria that make coverage of a different branch of government part of its criteria. If the White House wants to outsource... Interestingly, it seemed to me like in my last exchange with your colleague on the other side, he seemed to suggest that the White House criteria just is, are you credentialed or not by the Senate gallery? And we don't look behind how the Senate gallery is doing that and attribute that to the White House because they're not an agent or a delegee in that sense of the White House. It's just like a box you check off. Like, are you working for a bona fide publication and are you credentialed? And we don't look behind that. What does that do to your argument about unbridled discretion? I'm interested in how you conceptualize how the White House is responsible for what the committee does and what this does to your argument if, in fact, we don't look behind this box check. Are you credentialed or not? The same way that Judge Bates did below, which is to say it is constitutionally unreasonable for the White House to adopt a program that allows a decision to be made in the unbridled discretion of a congressional press gallery. It is true that the White House is not the one making the decision as to qualifications for the congressional press gallery, but it is unconstitutionally unreasonable for them to adopt a regime that allows the infection of this process with the unbridled discretion doctrine. And then finally, Honor, if I may, I didn't answer your question very well earlier about the Senate rules. You were pointing out that the Senate, the bona fide correspondence of repute in their profession under such rules as the Standing Committee of Respondents shall prescribe. This is not in the JA, but it is in the record. Judge Bates admitted it pursuant to our request for judicial notice. The House Periodical Press Gallery Rule 1, and I'm happy to provide your Honor the internet citation for this. Was this created by the same body? This was created by the House Periodical Press Credentialing Body. So why is that relevant? Well, I'm going to read it, Your Honor, because it informs, I believe, the Senate daily press gallery rules because it doesn't contain that same verbiage. I mean, the concept is these rules are pretty uniform across House, across Senate, across the press galleries must be bona fide resident correspondence of reputable standing. It doesn't be relevant only to the extent that the Senate gallery relies on it, and there's nothing in the record that says they do. There's nothing in the record that says they do, Your Honor. My point in citing this is to say that these rules are generally viewed as saying about the same thing and the language in the periodical press gallery. We're reviewing what the Senate gallery does just because there's another set of rules that whether they look at it or not. I just don't see how that's relevant. Fair enough, Your Honor. All right. Thank you. We'll take your case under advisement.
judges: Wilkins; Pan; Rogers